09-1497 YPI 180 N. LaSalle v. 180 N. LaSalle II 09-1497 YPI 180 N. LaSalle II 09-1477 YPI 180 N. LaSalle II My name is Robert Hermes and I am counsel for the APLE 180 LaSalle II LLC. I will refer to the parties this morning by the same nomenclature used in the briefs, Yauna, YPI, and LaSalle. At the outset, I would like to stress that LaSalle's motion below was based exclusively on the facts alleged in YPI's complaint and the exhibits attached thereto. Therefore, this Court, like the Court below, can decide this case as a matter of law. There are no fact questions to be resolved or that are necessary to the analysis. YPI's complaint purports to set forth a cause of action for rescission based on the doctrine of impossibility of performance. That doctrine is an extreme exception to the fundamental rule that a valid contract is to be enforced as written. In this case, the Court need look no farther than the actual contract between the parties to determine what the intent was, what was anticipated, and what was foreseeable. The contract before the Court is a fully integrated agreement. There is no financing contingency in the contract. The parties' contract was for an all-cash deal, pursuant to which YPI agreed, quote, to pay the purchase price in lawful currency of the United States by Federal Reserve wire transfer of immediately available funds. In the absence of any term in the contract dealing with financing, the baseline rule is that the buyer must pay all cash. It's the buyer who undertakes the risk that it will not be able to produce the cash at closing. But in this case, we don't have to stop there because this particular contract goes even further and into even greater detail. YPI specifically represented that its ability to perform, and the only performance obligation the buyer undertook was to come up with $120 million cash at closing, YPI specifically represented in writing that its ability to perform was not conditioned on any consent, approval, or authorization from any person or entity that had not already been obtained. More importantly, with respect to the earnest money that's at issue in this case, YPI also expressly agreed. So from that, you understood that to mean that they already had the cash? Whatever they needed to do, they represented they had it done. Didn't they represent that part of the monies would be financed? No, Your Honor. The contract has no mortgage contingency clause in it. It's a fully integrated agreement. There is an exhibit attached. There was an exhibit attached to the complaint, which was a ladder where they advised us that they had their finance. And then, of course, the financing, they allege, ended up falling through. But after they alleged that they had it. But to get back to the point of the earnest money itself, the contract still goes on and addresses the earnest money. And YPI also expressly agreed that the earnest money, quote, shall be credited against the purchase price at closing, but is hereby deemed earned by the seller and shall be not refundable for any reason whatsoever, except in the event of a default by the seller. The party's contract also clearly spelled out, again, in anticipation that for whatever reason you couldn't come up with the cash, the contract also clearly spelled out what was to happen if the closing did not occur by reason of any default by YPI. The counsel addressed the issue of impossibility, the doctrine of impossibility. Your opponent has argued it well and good. They were happy, thought they had a contract with Bank of America. Well, at least that's what's in the briefs. And it fell through because of this unprecedented collapse of the economy. And there was no money to be had from anyone. And lead us back to the contract, if you would be so kind. Sure. In addressing Justice Hall's question. Sure. First of all, Your Honor, I think that, you know, clearly these are sophisticated parties. The contract itself alleges how sophisticated, the complaint alleges how sophisticated YPI is. YPI took on one undertaking, and that was to come up with cash. Even today there's been no indication how much financing they need. Did they need 10 percent, 20 percent, 90 percent, just, you know, 5 million of the $120 million? Counsel, that's because, you know, no facts were taken. That's his whole point is that they need to, there should not have been a motion to dismiss because there were facts that were in dispute. But there are no facts to be in dispute, Your Honor, because they merged into the contract. The contract has an integration clause. And even had they pled in the complaint that the parties sat down and they talked about this, and here's an e-mail pre-contract where we said, of course, you know, we've only got 80 million in cash on hand. We're going to have to borrow 40 million to make this work. So even if they had evidence like that, it merges into the contract when the parties sign the contract and say all prior representations and understandings are gone, and the four corners of this document are what govern our relationship. And that's what took place here, and that's why the court below correctly recognized. There was a self-executing remedy here in place. When they didn't come up with the $120 million to close, my client properly under the contract terminated the contract and retained the earnest money. That was their sole and exclusive remedy. They couldn't, under the terms of the contract, sue for the balance of the purchase price. That was waived. Sole exclusive remedy, keep the earnest money. They could not sue Yowen or YPI for the damage that they sustained by having the property off the market for six months while it was under contract, waiting to see if they could close. They couldn't do that. That right was bargained away in exchange for the right to retain the earnest money in the event that YPI didn't come up with cash to close. Clearly, the parties contemplated that some circumstance could arise where YPI wouldn't come up with cash. But a circumstance of this magnitude, making it impossible for them to obtain financing? Who could have imagined that? Any time you undertake in a contract to pay a specific sum of money, unless you put in and leave yourself an out, that's the risk you undertake. That's the risk that they undertook here. They said, we will show up on the day of closing and we will wire transfer you the purchase price, full stop. I mean, essentially, that's what happened in the Morales case, too. So if in that Arthur Mary case, the plaintiff, instead of having high blood pressure and a hernia, had his legs amputated, had his legs cut out from under him altogether, that's when the doctrine of impossibility would have come to play. Is it not analogous to what has happened to your opponent and to his client, that their financial legs were cut out from under them and it was impossible for them to perform this contract? I think it's a different situation, Your Honor, because the possibility that one would not be able to come up with cash at closing is addressed in the contract. In the Arthur Murray case, there wasn't anything in the contract that said, regardless of your ability to dance, it simply wasn't addressed in the contract. Here it was, and that's what takes this case outside of the realm of impossibility of performance, because one of the elements is that what transpired was unanticipated. And here, the contract anticipated the possibility that the buyer wouldn't come up with the cash at closing. And because it's addressed in the contract, a fully integrated contract, that's why they cannot now rely upon this implicit, we understood and you understood and everybody knew that somebody was going to have to borrow some undefined portion of the purchase price in order to close this deal. Let me just be direct on this, because I want to make sure I understand your client's position. You are suggesting that the manner in which the contract treated the handling of the escrow, the earnest money, after there was an inability to come up with the purchase price, demonstrated that the parties, in fact, anticipated that this eventuality might happen. Precisely, Your Honor, because, for example, if you walk through the various steps in the contracting process, originally when the contract was first signed and the initial earnest money was put up, as is typically done in most real estate transactions, that earnest money was put into an escrow account and it was held by an escrow agent to be released only upon the joint order of the parties. However, as they moved through the transaction and various amendments were made to the contract, extending the closing date, providing certain credits, adjusting the purchase price, on two occasions as those amendments were signed, the earnest money was released from the escrow agent to my client under the language I quoted to the court before, expressly saying, it's been earned because of the fact that we've had your property tied up. It's been earned. I mean, the court can, if it wants, take judicial notice of the fact that we sold the property last month for $72 million, $250,000. Now, we can't sue Young or YPI for the difference between the 72 and the 120, because that's the contract. No, that's not part of the pleadings. But it illustrates, I think, Your Honor, that the contract here addressed the possibility. Let me ask you, so then are you saying that the failure to introduce a contingency financing, that that was also bargained out of the contract? If they wanted a contingency clause, they could have put it in. I mean, I think, you know, the Moelis case, Your Honor, is very instructive. That's the homeowner who had a mortgage contingency, allowed it to lapse, and then lost his job. Once they allow that mortgage contingency clause to lapse, they're just like our contract. Because there was a contingency, it expired, and so it went away. And so the buyer in that case simply, at the end of the day. But there was no contingency financing in this case. Correct. This was an all-cash deal. And so from the beginning, that was part of the bargain then. Is that correct? Precisely. I mean, how you're going to pay the purchase price is something that you bargain. You can bargain to pay it in installments. You can bargain to pay it if you obtain a certain amount of financing at a certain interest rate. And I think it's important to note here, Judge, if you look at paragraph 8 of the complaint, what they allege here was that they were not able to obtain financing. And I want to make sure I get this quote exactly correct, because I think it's important. They allege that they were unable to secure commercially practical financing. I mean, they're asking this court to be the only court in Illinois that has ever conflated impossibility and impracticality and sustained the defense. The only case that ever touched upon that was the O'Brien case. The O'Brien case gave lip service, as did its prior authorities. You know, if you look at the Levy case and the Fisher case, those all precede the Illinois Supreme Court decision in Leonard v. Autocar. And while those authorities touch upon and know that the restatement in some other jurisdictions would relax the rule and perhaps allow the doctrine to be sustained in instances of impracticality, only one Illinois court, O'Brien, squarely faced the issue. That was the pipeline case, where a contractor was supposed to lay some pipe underneath the expressway. He didn't get the job done, and he got sued. Another contractor came in and got the pipe laid, so he couldn't believe in possibility because it was possible. Someone else laid the pipe. And instead, he sought to, citing Fisher, rely upon the relaxed notion of impracticality rather than impossibility, and the O'Brien court said they were constrained. The courts were to follow the dictates of the Illinois Supreme Court in Leonard, impossibility is required, and the defense was not sustained. Mr. Hermes, I don't think you directly answered my sister's question. Why wasn't the collapse of the world economy a textbook example of impossibility of performance? What happened in the world economic climate back in 2008 or whenever it happened? Because what they're saying, Justices, is that the collapse of the world economy made it impossible for them to obtain commercially practical financing. That wasn't the promise that they made. They didn't promise to get financing. They promised to pay us cash without any contingencies or qualifications on it. That was the performance that they undertook. They didn't promise that they would borrow money and then pay us. They promised that they would pay us. Counsel, I'm sorry. What you're basically saying is that they contracted away their ability to claim that because the market fell through they don't have the money. For whatever reason, precisely, Justice, whatever reason they couldn't come up, if they didn't plan for the contingency of it, they bore the risk, and the self-executing remedy should stay in place. Thank you, Counsel. Thank you very much. Brief rebuttal? Yes, Your Honor. Your Honor, we're not here arguing about what the premise was in the contract as amended. The reason for the invocation of the doctrine, the reason for the doctrine, is to excuse a party from performing a promise for which it has contracted because of unforeseeable circumstances that makes it not necessarily impossible, but impossible or far more burdensome to perform than anyone anticipated when the contract was entered into. That's the purpose of the doctrine. Now, I'd just like to make several short points. Again, getting back to the notion of foreseeability, one's losing one's job, I would submit, is not the equivalent of the collapse of the world's financial markets. Again, this is a matter of degree. It raises fact questions of foreseeability. I would also here, while, again, I'm not suggesting that there wasn't the promise to pay that's found in the contract that Counsel just brought to the Court's attention, what I'm suggesting is, and what we've put in the complaint and what the facts would demonstrate were we given the opportunity, is that the parties knew that but for financing, there would be no transaction here. If you look at the First Amendment, which is to the contract, the contract is an exhibit to the complaint. It's also an exhibit to the memorandum in opposition, or excuse me, in support of the motion to dismiss. If you look at the First Amendment, attached to the First Amendment is an e-mail from the buyer to the seller, which says, among other things, in order for our lender to fund us, we would require to address these issues. These issues being a number of conditions in the building for which the buyer was seeking a credit. But it is clear beyond doubt that the complaint alleges and the facts would prove. Well, it's not in the contract. Well, I'm not suggesting it is a contractual undertaking, Your Honor. I'm suggesting that this evidences the fact that the parties, their reasonable expectations were that without financing, there would be no deal. Why didn't your contract say that, sir? Why didn't the contract say that? Why did it say it's an all-cash deal with no financing? Well, I would submit because that is the custom for this type of transaction for this type of property. But, again, I would also submit that the custom is that when parties are buying commercial towers involving the tens of millions of dollars that the sales do, that typically there are not mortgage contingency clauses in the contracts. That is just the way the industry functions. But, again, it's a question of foreseeability, and it's a question of what the parties expected regarding the functioning of the credit markets. And, again, there's references made both in the brief and in the court below by the defendant to Friedman's treatise on contracts about what parties typically do, you know, and what they could do, and could they include mortgage contingency clauses. What I submit to this Court, that by submitting that portion of that treatise and by citing to that treatise in the trial court implicitly was an acknowledgement that what parties do and what custom is an issue in this case. And I agree that it's an issue in this case, but I submit that it's an issue that cannot be conclusively determined by reference to a treatise. It raises fact issues. And, again, I submit that we should be given the opportunity to address those fact issues. So, in concluding, I would just urge the Court to look at the procedural posture and the facts of each case and see what factual determinations, what factual records the courts rested upon in reaching their decisions, and, again, how they decided the questions of foreseeability presented in each one of those cases. Thank you. Thank you, counsel. This matter was well argued. We will take it under advisement. This Court is adjourned.